J-A12032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.V., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: S.V., MINOR | : : : : : : | |
| | : | No. 3107 EDA 2022 |

Appeal from the Order Entered November 14, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000235-2022

BEFORE: OLSON, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.: **FILED AUGUST 2, 2023**

S.V. ("Child") appeals from the trial court's order adjudicating him dependent, to the extent that the order did not include a finding of child abuse against his parents, C.K. ("Mother") and P.V. ("Father"). We vacate and remand with instructions.

In March 2022, the Philadelphia Department of Human Services ("DHS") received a Child Protective Services ("CPS") report alleging that Child, 11 weeks old, was brought to the Emergency Room at St. Christopher's Hospital for Children with symptoms of diarrhea and vomiting. DHS Exh. 1 at p.5. The doctors noticed a "gaze deviation" and conducted a neurology MRI, which showed multiple hemorrhages around Child's brain. *Id.* A consult was completed with the neurology surgery unit and the findings were of non-accidental trauma. *Id.* Child was then admitted to the Intensive Care Unit. *Id.*

On March 9, 2022, DHS obtained an Order of Protective Custody and placed Child with his paternal uncle after he was released from the hospital.

DHS filed a dependency petition on March 15, 2022. An evidentiary hearing on the petition was held on November 14, 2022. DHS presented the testimony of Dr. Norrell Atkinson, a child abuse pediatrician and Director of the Child Protection Program at St. Christopher's. N.T., 11/14/22, at 7. She testified as both an expert witness in child abuse and as a fact witness based on her evaluation of Child at the hospital.[1] She stated that Child had presented to the hospital with "concerns for abnormal eye movement and kind of jerking of extremities, which are clinically concerning for seizure activity." *Id.* at 10. Dr. Atkinson noted that the MRI revealed several areas of bleeding on Child's brain, as well as retinal hemorrhaging. *Id.* at 10-11. Child was also having seizures, which indicated a significant head injury. *Id.* at 22. Mother and Father offered no explanation for the cause of Child's injuries. *Id.* at 19-20. Dr. Atkinson opined that Child's injuries were new and would have been sustained in the last 24 to 48 hours. *Id.* at 30. She also stated that additional testing and a skeletal survey was done, which yielded no indication of any bleeding disorders or any other medical conditions. *Id.* at 23. Child also had no underlying medical conditions that would have caused abnormal bleeding. *Id.* at 31. Dr. Atkinson determined that Child's injuries were caused by an external force from either "[s]ome type of full head rotational injury or

---

[1] The parties stipulated to Dr. Atkinson's expertise as a child abuse pediatrician. N.T. at 6.

acceleration/deceleration force to the head" or "some type of blunt force impact." *Id.* at 29. She stated that these types of head injuries could not have been sustained during normal caretaking activity. *Id.* at 24. Rather, this type of injury would have been caused by shaking, significant falls from heights, or car accidents. *Id.* at 24, 29. Dr. Atkinson concluded that Child suffered abusive head trauma. *Id.* at 11, 23, 27-28.

Dr. Atkinson spoke to Mother and Father separately at the hospital. *Id.* at 14. Mother reported that Child began vomiting two days prior to Dr. Atkinson's examination and then began having abnormal eye and body movements. *Id.* at 15. Neither parent reported a car accident, fall, or any other accident. *Id.* at 30. Mother and Father told Dr. Atkinson that Child had been solely in their care in the days leading up his hospitalization. *Id.* They explained that Mother primarily cared for Child during the daytime and Father cared for Child at night. *Id.* at 17-18. Paternal grandmother also would sometimes assist in Child's care at their house, but she was never alone with Child. *Id.* at 17, 30. Father and Mother also had three other children living at the house – ages 7, 8, and 13 – but the parents stated that they would supervise their children when they would hold Child. *Id.* at 20. Dr. Atkinson stated that it would be "unlikely" for a child under the age of 12 to inflict the type of injuries that were found on Child. *Id.* at 25.

DHS next presented Portia Henderson, DHS investigator. Henderson testified the family had no prior history with DHS. *Id.* at 42. She stated that as part of her investigation, she visited Child at the hospital and went to the

family's home. *Id.* Mother and Father told Henderson that no one watched Child except for themselves and paternal grandmother. *Id.* at 46, 49. Henderson testified that Mother and Father were unable to provide any explanation as to how Child's injuries occurred, but they understood the severity of Child's injuries. *Id.* at 46-47. They told Henderson that Mother generally cared for Child during the day and Father cared for him at night, and that paternal grandmother sometimes came over to assist. *Id.* at 48. The parents said that paternal grandmother came to assist recently because Father had surgery and Mother was not feeling well. *Id.* The parents stated that paternal grandmother was never alone with Child. *Id.*

Mother and Father informed Henderson that the other children in the house were not allowed to hold Child without their supervision. *Id.* at 46, 51. Henderson interviewed each child separately. *Id.* 46, 56. Henderson stated that the seven-year-old and eight-year-old children told her that they do not pick up Child and the 13-year-old child had no interest in being involved with Child because he was heavily into his video games. *Id.* at 47, 56. Henderson also testified that Mother and Father did not mention that they had adult children, but she later learned of this information. *Id.* at 49-50. The adult children did not live at the house. *Id.* at 50.

Henderson concluded that the CPS report was indicated, which meant "there was a finding of suspected child abuse because of the significant injuries that [Child] suffered and the fact that the parents couldn't provide an explanation for" the injuries. *Id.* at 54-55. She also noted that there was a

criminal investigation pending against Mother and Father stemming from Child's injuries. *Id.* at 64

Mother and Father did not testify at the adjudicatory hearing or present any evidence on their behalf.

The trial court adjudicated Child dependent because of Mother and Father's present inability to care for Child due to a stay-away order[2] against parents as to Child because of the related criminal proceedings. *See* Trial Court Opinion, filed 2/3/23, at 4. However, the court declined DHS's request to make a finding of child abuse against the parents. *Id.* Child, through his counsel, filed the instant appeal.[3]

Child raises the following issues:

1. Did clear, convincing, and competent evidence establish that [Child] suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of his parents, constituting *prima facie* evidence of abuse by Mother and Father pursuant to 23 Pa.C.S.[A.] §§ 6303(b.1) and 6381(d)?

2. Did the trial court err as a matter of law and abuse its discretion in failing to find [Child]'s parents perpetrators of child abuse, where clear and convincing evidence proved that parents were [Child]'s primary caretakers when he was a victim of child abuse, and they failed to rebut the presumption under 23 Pa.C.S.[A.] § 6381(d) because they presented no evidence?

Child's Br. at 6 (suggested answers and answers of trial court omitted).

_____

[2] *See* N.T. at 72, 74.

[3] DHS also filed a brief arguing that the court erred by declining to find child abuse against Mother and Father.

We review orders entered in dependency cases for an abuse of discretion. **In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). We must accept the findings of fact and credibility determinations if they are supported by the record, but we are not required to accept the trial court's inferences or conclusions of law. **Id.**

Child does not contest his dependency adjudication, but rather argues that the court abused its discretion in declining to make a finding of child abuse against Mother and Father pursuant to the Child Protective Services Law ("CPSL").[4] We address Child's two issues together since they are related.

"Although dependency proceedings are governed by the Juvenile Act, the Child Protective Services Law controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." **Interest of G.R.**, 282 A.3d 376, 380 (Pa.Super. 2022) (cleaned up) (footnotes omitted). Clear and convincing evidence means "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." **Interest of A.C.**, 237 A.3d 553, 558 (Pa.Super. 2020) (citation omitted).

As part of an adjudication of dependency, "a court may find a parent to be the perpetrator of child abuse," as defined by the CPSL. **Interest of S.L.**, 202 A.3d 723, 728 (Pa.Super. 2019) (citation omitted). The CPSL defines

---

[4] **See** 23 Pa.C.S.A. §§ 6301-6388.

"child abuse," in relevant part as "intentionally, knowingly or recklessly. . . [c]ausing bodily injury to a child through any recent act or failure to act." 23 Pa.C.S.A. § 6303(b.1)(1).

In certain cases, pursuant to section 6381(d) of the CPSL, the identity of the abuser need only be established through *prima facie* evidence. **Interest of A.C.**, 237 A.3d at 558. *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." **In re L.Z.**, 111 A.3d 1164, 1185 (Pa. 2015) (citation omitted). Section 6381(d) creates an evidentiary presumption and states:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child **shall be prima facie evidence** of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d) (emphasis added).

This presumption under section 6381(d) was established "to avoid the evidentiary conundrum where the existence of abuse is rather easily proven but the court is unable to assign responsibility for the heinous act among the responsible adults[.]" **Interest of A.C.**, 237 A.3d at 559 (citation and internal quotations omitted). Indeed, "when a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury

or failed in their duty to protect the child." *In re L.Z.*, 111 A.3d at 1185. Therefore, section 6381(d) "carve[s] out a very limited exception to [] more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in cases where the abuse is 'of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child.'" *Id.* at 1184-85 (quoting 23 Pa.C.S.A. § 6381(d)). Thus, "evidence that a child suffered injury that would not ordinarily be sustained but by the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption." *Id.* at 1185.

To rebut section 6381(d)'s presumption, the "parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive." *Id.* At that point, "[t]he evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the [] agency and the rebuttal of the parent or responsible person." *Id.* Out-of-court statements made by parents to a caseworker or treating doctor are not considered rebuttal evidence since they are neither under oath nor subject to cross-examination. *See id.* at 1186; *Interest of G.R.*, 282 A.3d at 385.

In sum, once the moving party establishes the existence of child abuse by clear and convincing evidence "of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child," *see* 23 Pa.C.S.A. § 6381(d), the burden then shifts to the parents or other responsible person to rebut the presumption that they perpetrated the abuse.

Here, the trial court found that DHS did not present clear and convincing evidence of child abuse. Trial Ct. Op. at 6. The court found that there were numerous caretakers for Child at the time of the incident, including Mother, Father, and paternal grandmother. *Id.* It also noted that there were adult children who had access to the home. *Id.* at 7. The court found that although the parents stated that none of their other minor children were permitted to be around Child without parental supervision, it was likely that the other children, including the 13-year-old "of unknown size," were assisting in some caretaking and were near Child absent supervision. *Id.* at 6, 7. The court emphasized that there was no family history of abuse or neglect and there was no evidence of more than one incident giving rise to Child's injuries. *Id.* at 6. The court also noted that Henderson testified that Mother and Father told her that they did not know how Child's injuries occurred and Henderson found their statements to be credible. *Id.* at 7. The court stated it could not conclude whether Child's injuries "were the result of child abuse . . . or the outcome of an innocent accident unknown to Mother and Father." *Id.* at 6-7.

Child argues that the court applied the wrong standard in denying DHS's request for a finding of child abuse. Child's Br. at 27. He asserts that the court improperly "identified its lack of certainty as to the various particulars of the surrounding circumstances as the basis to deny DHS's petition." *Id.* at 31. Child contends that the court should have found that DHS presented *prima facie* evidence of child abuse when it presented medical evidence of unexplained, inflicted, and non-accidental injuries to Child that would not have occurred but for the acts or omissions of his caregivers. *Id.* at 22. Thus, since DHS presented *prima facie* evidence of child abuse, Child argues that section 6318(d)'s presumption that Mother and Father were responsible for Child's injuries should have been triggered and the burden then shifted to the parents to rebut the presumption. *Id.* at 22-23. Child argues that since Mother and Father did not present any evidence, they failed to rebut the presumption that they were the perpetrators of the abuse. *Id.* at 23.

Upon review, we conclude the trial court erred in declining to make a finding of child abuse. The court declined to find child abuse because of the uncertainty as to certain circumstances surrounding Child's injuries. However, this logic is contrary to the dictates of section 6318 and is the precise situation that section 6318 sought to address. At the adjudicatory hearing, DHS presented uncontroverted medical evidence that Child, who was 11 weeks old at the relevant time, suffered injuries that were the result of non-accidental trauma that occurred while Mother and Father were responsible for Child. Dr. Atkinson concluded that Child's injuries were the result of abusive head

trauma. N.T. at 11, 27-28. She testified that Child suffered from bleeding on the brain and retinal hemorrhaging. *Id.* at 10-11. Child also was having seizures, which indicated a significant brain injury. *Id.* at 22. Dr. Atkinson stated that Child's injuries were caused by an external inflicted force or blunt force impact to the head and were not the type of injuries that would have been sustained in normal caretaking. *Id.* at 24, 29. The injuries were new and were sustained 24 to 48 hours prior to Child's hospital admission. *Id.* at 30. Further, Child had no underlying medical conditions or bleeding disorders that would have caused abnormal bleeding. *Id.* at 23, 31. Thus, DHS sustained its burden of proving by clear and convincing evidence that Child suffered from abuse.

Under these facts, the court should have applied the evidentiary presumption under section 6381(d), which establishes a *prima facie* case of abuse by the persons who were responsible for the child when the abuse occurred, which in this case were Child's parents. The burden then shifted to Mother and Father to rebut the presumption. **See In re L.Z.**, 111 A.3d at 1185. Mother and Father did not present any rebuttal evidence – testimony or otherwise – at the hearing. Thus, Mother and Father failed to rebut section 6381(d)'s presumption. As a result, the trial court erred as a matter of law by failing to find Mother and Father the perpetrators of Child's abuse pursuant to section 6381(d). **See Interest of G.R.**, 282 A.3d at 385. Therefore, we vacate the trial court's order and remand for the trial court to re-enter the order and include a finding that Child is the victim of abuse by Mother and Father.

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/02/2023